**B.A. BALLOU AND COMPANY, INC.**

v.

**The UNITED STATES.**

No. 247–82T.

United States Claims Court.

March 29, 1985.

first accrued.

H. Peter Olsen, Providence, R.I., attorney of record for plaintiff; Hinckley & Allen, Providence, R.I., of counsel.

W.C. Rapp, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., attorney for defendant; Theodore D. Peyser, Jr., Dept. of Justice, Washington, D.C., of record.

## MEMORANDUM OF DECISION

HARKINS, Judge:

Plaintiff sues for refund of $1,146,320, plus interest as provided by law, of federal corporate income tax for tax years 1975, 1976, 1977 and 1978. The case is before the court on cross-motions for summary judgment. The material facts either have been stipulated, or are not challenged, and are not in dispute. Without oral argument, for the reasons that follow—defendant's motion is allowed.

## FACTS

B.A. Ballou and Company, Inc., plaintiff, a Rhode Island corporation, is engaged in the manufacture of jewelry, jewelry findings and electronic components. One of the raw materials used in plaintiff's manufacturing operations is fine gold (karat gold), which is used as a raw material in its manufacture of jewelry. In addition to fine gold purchases, plaintiff in the years in issue had substantial purchases in alloy ounces of fabricated gold from suppliers in production-useable forms, such as tubing and rods.

Plaintiff files its federal income tax returns on a February 28 (29) fiscal year basis, and employs the accrual method of accounting. Effective for its tax year ending February 28, 1969, plaintiff elected the LIFO method for its inventory of fine gold. This election corresponded with the government's decision to "close the gold window" on March 13, 1968. For 33 years prior to that date, gold could be purchased from the Federal Government for $35 per ounce by properly licensed persons, such as plaintiff. Gold was prohibited from sale on the open market. From March 13, 1968, to January 1, 1975, plaintiff was licensed to purchase, but not to sell, gold on the open market.

On January 1, 1975, the United States government lifted its restriction on the buying and selling of gold. From that point on, plaintiff has been free to both purchase and sell gold on the open market.

Beginning in its fiscal year ending February 28, 1975, plaintiff purchased quantities of gold during the last two months of its fiscal year and resold it at or near the beginning of the following year. Plaintiff's purchases of gold during January and February of each of the years in dispute, the amounts resold in March, and the net amounts purchased during the remainder of the succeeding fiscal year, are as follows:

| Fiscal Year Ending February 28 | Jan./Feb. Purchases | March Sales | Net Purchases (sales) In Succeeding Fiscal Year ** |
|---|---|---|---|
| 1975 | 11,032 | 11,000 | (688) |
| 1976 | 19,000 | 17,000 | 7,000 |
| 1977 | 18,300 | 13,200 | 11,000 |
| 1978 | 17,025 | 12,000 | 13,230 |

** Exclusive of purchases in the succeeding January and February.

All gold purchased by plaintiff was purchased with a profit motive. Plaintiff realized a gain on the sale of gold during the years in dispute as follows:

| 1975 | $ 99,000 |
|---|---|
| 1976 | 13,000 |
| 1977 | 182,000 |
| 1978 | 4,000 |

All of plaintiff's transactions in issue respecting fine gold were between plaintiff and the Rhode Island Hospital Trust National Bank. The transactions were accomplished by transfer of cash to or from plaintiff's checking account, or via its lines of credit. All purchases by plaintiff were made at market prices. Each purchase involved capital outlays by plaintiff and the assumption of market risks. Purchases on credit involved interest expenses.

As soon as the gold was purchased by plaintiff, title to the gold became vested in plaintiff. After title shifted to plaintiff, the gold was retained in a storage facility at or used by the bank, and none of the gold which was the subject of IRS inventory adjustments was ever delivered to plaintiff. It is customary in the gold jewelry industry to store gold inventory with a supplier prior to use of the gold by the manufacturer.

Plaintiff had dominion and control at all times over the gold purchased. All fine gold owned by plaintiff consistently has been treated by plaintiff, for tax and financial accounting purposes, as inventory.

In filing its federal corporate income tax return, plaintiff included in its ending inventory all fine gold purchased by it during January and February of the appropriate fiscal year. This resulted in a higher ending inventory, an increase in cost of goods sold, and a resulting reduction in taxable income and federal tax. On audit, the Internal Revenue Service removed from inventory the gold purchased in January and February but resold during March and April of the succeeding fiscal year (the IRS adjustments). This resulted in a lower ending inventory, a decrease in cost of cost of goods sold (as a result of penetration of lower-cost LIFO layers), and a resulting increase in taxable income, and federal tax.

None of the gold which was the subject of the IRS adjustments was purchased for sale in the ordinary course of business to plaintiff's jewelry customers, or for incorporation into a product for sale to plaintiff's customers in the ordinary course of business. During the years in issue, plaintiff purchased fine gold during January and February in order to maintain its LIFO gold inventory pool. The purpose of plaintiff's purchases, consistent with the recognized purposes of LIFO inventory accounting, were to charge current revenues with current inventory replacement costs. When plaintiff's year-end gold purchases are excluded from the LIFO inventory pool, lower cost LIFO layers are penetrated. Prices for fine gold purchased by plaintiff for fiscal years 1971 through 1974 ranged from $37.50 to $174.45 per ounce. During the years in issue, the actual cost of gold purchased by plaintiff ranged from $125 to $226.70 per ounce.

All gold purchased by plaintiff was subject to its hedging procedures, which are used by plaintiff to even out the cost of its gold inventory. Plaintiff fully or partially hedged each of the transactions in which it purchased gold which is the subject of the IRS adjustments.

During the years in dispute, plaintiff purchased fine gold to maintain its LIFO pool, and resold any excess gold that it did not need for immediate operations. The LIFO pool was maintained at levels which would be adequate to meet future sales, which plaintiff's management expected to increase, after low years in 1975 and 1976, to prior higher levels.

The determination by plaintiff as to how much of the fine gold purchased by it would be used in production, and how much would be resold, was not made by plaintiff until after the end of its fiscal year. February and March, the last and first months respectively of plaintiff's fiscal year, are strong ordering months in the jewelry industry because of spring and early summer holidays and special events such as Easter, Mother's Day, weddings, and graduations. Plaintiff's determination as to how much gold it would sell was made after reviewing the quantities of orders it was receiving during this period.

Plaintiff engaged during the periods in issue in many gold futures transactions. During plaintiff's tax year ending February 28, 1979, plaintiff experienced gains in the amount of $203,141 on consummated gold futures transactions. During the same tax year, a new layer of inventory was added to plaintiff's LIFO gold karat pool, i.e., there was a greater number of ounces of gold in inventory at the end of the year than at the end of the preceding year. Plaintiff reduced its 1978 ending inventory by its 1978 gains on consummated gold future transactions to the extent of the increased LIFO layer for the tax year. This reduction in the value of ending inventory resulted in a higher figure for cost of goods sold, and lower net taxable income. For plaintiff, the first time these two elements (i.e., a new layer of inventory and gains on consummated gold futures transactions) were present at the same time to any significant extent was on February 28, 1978. Plaintiff realized no gold future gains or losses in years prior to February 28, 1974. In the year ending February 28, 1974, there was a small (153 ounces) increase in the gold LIFO pool. The applicable gains would have reduced inventory and increased cost of goods sold by approximately $60,000, or less than 1 percent of inventories of $6,360,000. The situation did not exist in February 1976 or 1977, as the gold LIFO pool decreased in each of those years. The 1976 and 1977 decreases completely eliminated the 1974 and 1975 layers from the gold LIFO pool.

DISPOSITION

The principal issue in this case is whether the Treasury Regulation on inventory accounting (Treas.Reg. § 1.471–1 (1960)) and the IRS adjustments to inventory for the years in dispute produce a computation that does "clearly reflect income". 26 U.S.C. § 446(b) (1982). Defendant contends the fine gold purchased by plaintiff during January and February and sold during March and April was not purchased for purposes cognizable under the regulation. According to defendant, section 1.471–1 permits plaintiff to include in its fine gold inventory only that gold which was to be resold in the course of business or which physically was to be incorporated into some product intended for sale as part of plaintiff's jewelry business. Plaintiff contends the IRS construction of the regulations is too narrow and argues that its gold purchases in January and February were made for legitimate business reasons, consistent with the purposes of LIFO inventory accounting. The inclusion in inventory of all of its gold purchases, according to plaintiff, clearly would reflect income because it would maintain plaintiff's LIFO pool so that current revenues would be charged with current costs.

■ Inventory accounting is governed by I.R.C. §§ 446 and 471. As a general rule, taxable income is to be computed under the method of accounting regularly used by a taxpayer in keeping his books. I.R.C. § 446(b) permits an exception. If the method regularly used by the taxpayer does not clearly reflect income, the computation of taxable income is to be made under such method as, in the opinion of the Secretary, does clearly reflect income. 26 U.S.C. § 446(b) (1982). Treasury Regulations define "method of accounting" to include not only the overall method of accounting by the taxpayer, but also the accounting treatment of any item. Treas. Reg. § 1.446–1(a) (1957).

I.R.C. § 471 states the general rule for inventories:

Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

■ I.R.C. §§ 446 and 471, with their accompanying regulations, confer broad powers that are invoked when the IRS determines that a particular method of inventory accounting should be disallowed because it does not clearly reflect income. A disallowance of an inventory accounting method is not to be set aside unless it plainly is shown to be arbitrary. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532, 99 S.Ct. 773, 780, 58 L.Ed.2d 785 (1979).

Plaintiff is in the business of manufacturing jewelry, the sale of which includes fine gold as an income producing factor. In order to reflect taxable income correctly, plaintiff is required to maintain an inventory for its fine gold. The Treasury Regulation on the need for inventories (Treas.Reg. § 1.471–1) in pertinent part provides:

In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. The inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale, in which class fall containers, such as kegs, bottles, and cases, whether returnable or not, if title thereto will pass to the purchaser of the product to be sold therein. Merchandise should be included in the inventory only if title thereto is vested in the taxpayer.

Gross income, in a manufacturing business where the use of an inventory is required, is computed by subtracting from total sales of manufactured goods, the cost of goods sold, and the addition of any income from investments and from incidental operations. Treas.Reg. § 1.61–3(a), T.D. 7207, 1972–2 C.B. 106. Cost of goods sold includes a computation for inventory: inventory on hand at the beginning of the year is found, to which the total of purchases during the year is added, and inventory on hand at the end of the year is subtracted. "Cost of goods sold" equals "beginning inventory" plus "inventory purchases" minus "ending inventory." Under last-in-first-out (LIFO) accounting, at the end of each year it is assumed that inventory on hand is made up of inventory purchased earliest in time. *See generally* Treas.Reg. §§ 1.471–11 (1973), 1.472–1 (1960), 1.472–2, T.D. 6539, 1961–1 C.B. 167.

In LIFO accounting, the last costs incurred are the first costs charged to current operations, and the first costs incurred are accumulated in ending inventory. LIFO inventory accounting serves two purposes: (1) to the extent quantities of goods on hand at the end of the tax year are the same as the goods on hand at the beginning of the tax year, the LIFO method charges current revenues with amounts approximating current replacement costs, and (2) during an inflationary period, LIFO offers tax relief from an inventory profit in an inflationary market.

With respect to a raw material or a supply for which inventory accounting is required because it is an income-producing factor, Treas.Reg. § 1.471–1 provides that the *only* raw material or supply to be included in inventory is that which was acquired for sale or which physically will become a part of merchandise intended for sale. An examination of the purpose for which the manufacturer acquired the raw material or supply is required. Defendant argues that where the facts show that a taxpayer acquired a raw material or supply that was not purchased for sale in the regular course of business or for physical incorporation in merchandise intended for sale in the regular course of business, such acquisitions may not be included in closing inventory. Defendant says plaintiff's pecu-

liar purchases and sales at the close of each fiscal year show that, in fact, plaintiff's raw material, the adjusted fine gold, was not purchased for inventory purposes.

Plaintiff counters that defendant's interpretation is too narrow, that it is unsupported by relevant law, and that it constitutes an unauthorized foray into the decision making process of plaintiff's management. According to plaintiff, a manufacturer's raw materials are inventoriable if they have been acquired in transactions that were made for legitimate business purposes and which effected a beneficial interest other than the reduction of taxes.

The facts show that plaintiff's fine gold that was subject to IRS adjustments was purchased because plaintiff's management determined that it was inadvisable to invade its LIFO gold inventory pool because of uncertain conditions in the gold market, and because it expected sales in the future to increase to prior high levels. During 1975 and 1976 plaintiff's sales of jewelry containing fine gold dropped substantially as a result of an unprecedented fluctuation in gold prices as a reaction to the United States government's deregulation of gold. Plaintiff argues that if the year-end gold purchases were not made, plaintiff would have had to charge its revenues during 1975 and 1976 with low cost gold when the actual cost of gold at that time ranged from $125 to $225 per ounce. These year-end purchases, plaintiff asserts, had a substantial economic effect in that they resulted in a matching of plaintiff's current costs with current revenues and afforded relief against inventory profits in an inflationary market.

Plaintiff emphasizes that the gold subject to the IRS adjustment was purchased in bonafide business transactions made for legitimate business reasons that were consistent with the recognized purposes of LIFO inventory accounting. Plaintiff also emphasizes that its treatment of inventory was in accordance with generally accepted accounting principles for reflection of income.

It is clear that all fine gold owned by plaintiff consistently has been treated, for both tax and financial accounting purposes, as inventory. It is also clear that plaintiff's year-end gold purchases were legitimate business transactions made on the open market using practices that are customary with gold jewelry manufacturers. Plaintiff had dominion and control over the gold purchased by it. Its purchases of the gold subject to the IRS adjustments satisfy the requirement of the regulation that merchandise is to be included in inventory only if title is vested in the taxpayer. The accounting treatment used by plaintiff for its gold inventory is appropriate for reporting income for financial accounting purposes and was in accordance with generally accepted accounting principles.

 Conformity with generally accepted principles, however, does not establish a realization of an economic benefit cognizable in the tax law, and it does not necessarily determine whether particular transactions are in compliance with the requirements of Treasury regulations applicable to accounting for inventory. The treatment of a transaction for financial accounting purposes, on the one hand, and for tax purposes, on the other, need not necessarily be the same. *Frank Lyon Co. v. United States*, 435 U.S. 561, 577, 98 S.Ct. 1291, 1300, 55 L.Ed.2d 550 (1978). Financial accounting techniques have objectives that are different substantially from the objectives sought in tax accounting. The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested. The major function is to protect parties properly interested from being misled. The primary goal of the income tax system, in contrast, is the equitable collection of revenue. The major responsibility of the IRS is to protect the public fisc. *Thor Power Tool Co. v. United States*, 439 U.S. at 542, 99 S.Ct. at 786. Financial accounting is hospitable to estimates, probabilities and reasonable certainties. The tax law, however, cannot indulge in such uncertainty. The computation of taxable income for a particular tax year

requires precision as to the transactions applicable to that year. *Ibid.* at 543, 99 S.Ct. at 786.

In section 1.471–1, the regulation states the test for inclusion in inventory of a raw material or supply item that is an income-producing factor. The purpose for which the item is acquired is a major determinant. The need for examination of the purpose of a raw material purchase as a test has long been recognized. *Latimer-Looney Chevrolet, Inc. v. Commissioner*, 19 T.C. 120 (1952).

■ Plaintiff has not demonstrated that the criteria the IRS has established are unreasonable for the computation of taxable income for a particular year. Nor has plaintiff shown that the application of these criteria in the IRS adjustments was unlawful or arbitrary as a means to reflect plaintiff's income from its jewelry business in the years in dispute. The gold subject to the IRS adjustments was not acquired for sale in the ordinary course of business or to be incorporated in a product intended for sale in the ordinary course of business.

Plaintiff's position is that, once it is established that fine gold as a class is an income-producing factor, all of that class is inventoriable regardless of whether it was purchased for the purposes stated in the regulation, or for other purposes. Gold acquired for speculation, investment, or for tax advantage, in plaintiff's analysis, would be included in inventory on the ground that such computation would reflect income. The tax law applicable to inventory accounting is more finely tuned. The computation of inventory that is permissible must reflect income from plaintiff's jewelry manufacturing business for the particular years involved. Any beneficial interest or economic effect in plaintiff's gold transactions must be related to the purposes of inventory as an income-producing factor.

Plaintiff maintains an inventory of fine gold because its business is to manufacture jewelry. Plaintiff is not in the business of trading in gold. Its gold purchases that were subject to IRS adjustments were without significant purpose in plaintiff's jewelry manufacturing business. Plaintiff's purpose was to provide an artificial increase in inventory to avoid penetration of LIFO layers for tax reasons.

Plaintiff asserts that, in addition to maintaining its LIFO pool, the year-end purchases also were for the purpose of building supplies for jewelry manufacturing because it did not determine how much of the fine gold purchased would be used in production and how much would be sold until after the end of the fiscal year. In addition, plaintiff claims that it decided to maintain its gold inventory pool because of a perceived need for higher inventories to support possible business acquisitions.

These secondary reasons as to the purpose of plaintiff's purchases are not significant. Treas.Reg. § 1.471–1 permits gold that was acquired to physically become a part of merchandise intended for sale to be included in inventory. None of the gold that was the subject of the IRS adjustments was purchased for sale in the ordinary course of business, or for incorporation into a product for sale to plaintiff's customers in the ordinary course of business.

The IRS adjustments affect gold that was acquired to avoid penetrating LIFO layers and charging out to cost of sales lower priced inventory on the basis of its management's estimates of likely future business conditions. The IRS adjustments removed only the amounts of fine gold that plaintiff was using to inflate inventory temporarily for income tax purposes.

Plaintiff's use of an inventory treatment for its financial accounting which differs from that allowed by the IRS adjustments, while reasonable for planning purposes, is not adequate to clearly reflect income for tax accounting purposes for the years in issue. To maintain its LIFO inventory for tax accounting purposes, plaintiff's transactions must meet statutory and regulatory definitions. Plaintiff's transactions under tax accounting standards do not effect a beneficial interest other than reduction of taxes. In fact, the gold that was subject to

the IRS adjustments did nothing to increase plaintiff's inventory of fine gold for its manufacturing business for the years in dispute.

Plaintiff's basic complaint is that it is now being forced to pay tax on the increased value of its raw materials when they are actually used; this plaintiff rather would not do. This type of situation, however, always applies when materials that have increased in value are sold.

Both parties cite *United States v. Ingredient Tech. Corp.*, 698 F.2d 88 (2d Cir. 1983), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366, as support for their respective positions. On its facts, *Ingredient Tech.* does not present an inventory problem that is comparable to plaintiff's. *Ingredient Tech.* was concerned with sham transactions without business purpose, secret negotiations and intentional destruction of documents. None of that is present in this case. The Second Circuit's analysis was made in the framework of a criminal fraud conviction, and the decision upholding the criminal conviction is not apposite to either party's theory in this case.

Count II of plaintiff's complaint involved the question of accounting for hedging gains during 1978, a period in which a new LIFO inventory layer was added. The decision on count I to exclude plaintiff's year-end gold purchases from its LIFO inventory moots count II and no decision is made with respect to the legal issues there involved. Similarly, no decision is made on defendant's contention that plaintiff's accounting for hedging gains for 1978 amounted to a change in the method of accounting that required IRS consent under IRC § 446(e).

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is ALLOWED and plaintiff's cross-motion is DENIED. The Clerk is directed to dismiss the complaint.