Kenneth L. and Catherine S. MULHOLLAND, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 645–85T.

United States Claims Court.

Jan. 30, 1989.

John A. Craig, Hawthorne, N.Y., attorney of record, for plaintiffs.

William K. Drew, Washington, D.C., with whom was Acting Asst. Atty. Gen. James I.K. Knapp, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

### INTRODUCTION

Kenneth and Catherine Mulholland, husband and wife (taxpayers/plaintiffs herein), filed the instant tax refund suit on October

30, 1985, seeking a refund of federal income taxes assessed by the Commissioner of Internal Revenue (Commissioner) against their joint individual income tax returns for taxable years 1981 and 1982. This tax refund suit arose because the Commissioner determined that the method of accounting for deductible interest expense employed by Quincy Associates, Ltd. (Quincy), a partnership,[1] *i.e.,* pursuant to the Rule of 78's method,[2] resulted in claimed interest expense in excess of the amount otherwise economically accrued. Consequently, the Commissioner concluded that such *excess* interest expense was currently nondeductible during the taxable years in issue.

In their three-count complaint, however, the taxpayers allege that: (i) the Commissioner erroneously determined that Quincy was *not* entitled to deduct interest expenses, calculated pursuant to the Rule of 78's method of accounting, to the extent that such method resulted in claimed interest expense in excess of the amount accruable under the *rationale* of Revenue Ruling 83–84, 1983–1 Cum. Bull. 97 (hereafter Rev.Rul. 83–84);[3] alternatively, (ii) the Commissioner abused his discretion under 26 U.S.C. § 7805(b)[4]: (a) in failing to apply the *rationale* of Rev.Rul. 83–84 on a prospective only basis to interest accruing on notes and loan transactions entered into on or after June 6, 1983; and (b) in exempting short-term consumer loans from its mandates; alternatively, (iii) the Commissioner erred in refusing to allow Quincy to utilize the procedures outlined in Revenue Procedure 84–28, 1984–1 Cum.Bull. 475 (hereafter Rev.Proc. 84–28).[5]

The foregoing matter is currently before this court for consideration of the parties'

---

**1.** Quincy Associates is a limited partnership in which Kenneth Mulholland was a limited partner during subject taxable years.

**2.** "The Rule of 78's method [often referred to as the sum-of-the-digits method] is a mechanical *formula* for allocating interest to time periods during the life of a loan." _____ Taxes 312, *The Rule of 78's in Light of Revenue Ruling 83–84* (April 1985). The formula was named thus because many installment contracts in the early 1900s were for 12 months, and because the sum of the digits 1 through 12 is 78. Altman, *supra* at 11.26. Under the Rule of 78's method of allocation, the total amount of interest to be allocated during the life of a loan is multiplied by a fraction, *i.e.,* the number of remaining months to maturity (the numerator) divided by the sum of the number of months in the original term (the denominator). Gertzman, *Federal Tax Accounting* ¶ 3.03[3][a], 3–26 n. 85. When the Rule of 78's method is used to calculate the interest expense deduction, in each succeeding year this reducing fraction is applied to the total interest due, and the product thereof is expensed as interest for the taxable year.

By way of example, interest for the first year on a three-year note would be calculated as follows:

$\frac{3}{6} \times$ total interest due = Rule of 78's interest. Interest for the second year would be:

$\frac{2}{6} \times$ total interest due = Rule of 78's interest. The calculation would continue accordingly and would result in a declining ratio of interest being expensed each month. Gertzman, *supra* at 3–26 n. 85.

"Application of the 78's method to short-term loans generally produces a mild acceleration of interest recognition", *i.e.,* more than the stated interest rate would be expensed per period.

_____ Taxes at 312. However, when applied to long term notes, acceleration of interest recognition under this method may, depending on the surrounding circumstances, produce amounts which materially distort the true cost of borrowing, *i.e.,* the actual interest rate. Altman, *supra* at 11.27. Thus, during the early years of a long-term loan, the Rule of 78's method could produce an allocation of interest that exceeds not only the contract interest rate, but also the actual total payments made by the borrower, and likewise received by the lender. _____ Taxes at 312.

**3.** "Revenue Ruling 83–84 declared the 78's method unacceptable for recognizing interest, except for certain short-term consumer loans." _____ Taxes 312, 319, *The Rule of 78's in Light of Revenue Ruling 83–84* (April 1985).

**4.** 26 U.S.C. § 7805(b) provides in relevant part: "Retroactivity of regulations or rulings. The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulations, relating to the internal revenue laws, shall be applied without retroactive effect."

**5.** Under Rev.Proc. 84–28, certain taxpayers who previously filed federal income tax returns reflecting interest deductions computed under the Rule of 78's were permitted to change to the method prescribed in Rev.Rul. 83–84 beginning with the taxpayer's first taxable year ending on or after December 31, 1983. The benefits of that procedure permit the taxpayer to take into income any adjustment from such change over an extended period rather than all of the adjusted amount in the year of change.

cross-motions for *partial* summary judgment on Counts II and III, filed January 23, 1987 and March 30, 1987, respectively.[6] Additionally, jurisdiction properly lies in this court pursuant to sections 6532(a)[7] and 7422(a)[8] of the Internal Revenue Code of 1954, 26 U.S.C. §§ 6532(a) and 7422(a), and the Tucker Act, 28 U.S.C. § 1491. We find favorably for defendant on Count II; as to Count III, we find unfavorably as to both plaintiffs and defendant.

FACTS

The court finds the following operative facts to be undisputed and established by the parties.

6. The parties have stipulated that Count I is not currently before the court because of genuine issues of material fact.

7. 26 U.S.C. § 6532(a) provides in relevant part: "Suits by taxpayers for refund.—(1) General rule.—No suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary or his delegate renders a decision thereon within that time, nor after the expiration of 2 years from the date of mailing by certified mail or registered mail by the Secretary or his delegate to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates."

8. 26 U.S.C. § 7422(a) provides in relevant part: "No suit prior to filing claim for refund.—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof."

9. Apparently, Quincy Associates partnership units were offered to individuals seeking the economic benefits of a tax shelter. In its Private Placement Memorandum dated October 2, 1980, prospective investors were advised as follows:

SUITABILITY STANDARDS

A substantial number of state securities commissioners have established Investor suitability standards for the marketing within their respective jurisdictions of securities of so-called "tax sheltered" programs.... Some have also established minimum dollar levels for purchases in their states. The reasons for these standards appear to be, among others,

Quincy was incorporated in August 1980 under the laws of the State of Florida for the purpose of acquiring, owning, leasing, and operating a 95,536 square foot shopping center in Quincy, Florida. During subject taxable years, Quincy used the accrual method of accounting for federal income tax purposes, and reported income on a calendar-year basis. The structure of the Quincy partnership was designed by its corporate sponsor, FDI Financial Corporation (FDI), to utilize the Rule of 78's method of allocating interest expense between various taxable periods, *i.e.*, for federal income tax purposes.[9] Notwithstanding,

the relative lack of liquidity of securities of such programs as compared with other securities investments, and that the relative financial benefit of such investments will generally depend substantially on the tax bracket of the Investor. *Investment in the Units involves a high degree of risk and is suitable only for persons of substantial financial means....*
The Partnership has adopted as a general Investor suitability standard the following requirements: (a) He is acquiring the Units for investment and not with a view to resale or distribution; (b) he can bear the economic risk of losing his entire investment; (c) he has the following financial ability set forth on *either* of the tables below: [Table omitted.] (emphasis added).
The partnership also determined that the investor must be in *at least* the 49% income tax bracket and have a net worth of at least $100,000.00. Under the heading "Definitions," the offering stated:
The subscriber in good faith believes that he shall have sufficient income in each of the calendar years 1980–1985 which, upon application of the *tax losses* from the Partnership during such years, would provide a reduction in Federal income taxes equal to at least 49% of such Partnership losses, or a reduction in combined Federal and State tax of 50%. (emphasis added).
Finally, the offering advised potential investors:
(f) *Decline in Tax Losses.* In the early years an Investor should *realize substantial tax losses, due primarily to the Partnership's use of component depreciation and the interest costs of the Wraparound Mortgage....* [T]ax losses from this investment are expected to be realized beginning in 1980. It is anticipated that beginning in 1991, the Project will generate taxable income, and commencing in 1996, the taxable income will exceed the anticipated cash distributions to the Investors in that year and subsequent years. Accordingly, commencing in 1991, the Investors will be subject to income tax on income generated by the

Quincy did not seek a ruling from the Internal Revenue Service regarding its anticipated use of the Rule of 78's method for computing interest expenses.

Quincy purchased subject shopping center from First Delaware Equity Corporation for the aggregate purchase price of $2,417,000.00, payable as follows: $192,000.00 in cash at closing, the balance payable in the form of a nonrecourse purchase money wraparound note [10] and mortgage (collectively referred to as wraparound mortgage) in the gross amount of $7,268,249.00—$2,279,000.00 representing the principal balance and $4,989,249.00 representing interest at 10% [11] per year.

The interest portion of the above-stated gross amount equalled the aggregate interest payable on said principal over the life of the wraparound mortgage, *i.e.*, from the initial payment (made sometime on or before November 30, 1980) to December 31, 2003. The wraparound mortgage was payable in constant monthly installments of principal and interest. Subject wraparound mortgage could be prepaid; and if prepaid, interest due thereon was to be credited or rebated in accordance with the Rule of 78's (see n. 2 *supra*).[12] No prepayment, however, was made by Quincy during taxable years 1981 and 1982.

Plaintiff Kenneth Mulholland (Mulholland), a resident of Delaware, purchased a share in the Quincy partnership on November 14, 1980. At that time, Mulholland paid a total of $28,750.00 for his interest: $1,150.00 was paid in cash to FDI and the balance of $27,600.00 was paid in the form of a promissory note in favor of Quincy. In making his decision to buy into the Quincy partnership, Mulholland relied upon various written information regarding the federal tax consequences of Quincy's venture (including the use of the Rule of 78's method for calculating deductible interest expense), that was provided in Quincy's Private Placement Memorandum dated October 2, 1980, and a proposed tax opinion

Partnership. See "Federal Tax Consequences" and also the Accounting Projections attached to this Memorandum.

Defendant's Appendix B, pp. A76–77, and A123.

It is therefore clear to the court that based upon the previously-cited language, the offering (i) was designed to provide a tax shelter; (ii) solicited individuals in at least the 49% income tax bracket, who could afford to invest the requested amount without the expectation that said Project would produce taxable income for *at least* eleven years; and (iii) was designed to produce losses which would offset the investor's taxable income to the extent of at least 49% of the partnership's losses.

10. Purchase money is the actual money paid in cash or check (here $192,000.00) for property, while the balance may be secured by a mortgage and note (here the nonrecourse note), calling for periodic payments. *Black's Law Dictionary* 1111 (5th ed.1979).

A nonrecourse loan is a type of loan secured by property or securities that bars the lender from action against the borrower if the security's value falls below the amount required to repay the loan. Thus, one who holds a nonrecourse loan, as lender, holds an instrument which gives him no legal rights against prior endorsers or the drawer to compel payment if the instrument is dishonored. *Black's Law Dictionary* 953 (5th ed.1979)

A wraparound mortgage is a second mortgage which wraps around or exists in addition to a first or other mortgage. It is a form of second-ary financing used typically on old properties having first mortgages with low interest rates in which the lender assumes the developer's first mortgage obligation and also loans additional money to the developer. The lender takes back from the developer a junior mortgage in total amount at an intermediate interest rate. *See ICM Realty v. Cabot, Cabot, and Forbes Land Trust,* 378 F.Supp. 918, 923 n. 6 (S.D.N.Y.1974).

11. Although Quincy's Private Placement Memorandum dated October 2, 1980, indicates that a 10% interest rate was to be applied to the wraparound mortgage, IRS Form 4605–A, dated September 12, 1984, and prepared by Michael Hudak (revenue agent) as the proposed changes to Quincy's 1981 and 1982 interest calculations on the wraparound mortgage reflects that "[i]nterest [was] calculated in accordance with the 'Rule of 78's' at the rate of 11.76996% per annum." Plaintiffs' Appx. B, p. 324.

12. Defendant's Ex. 6, A86 (Quincy's Private Placement Memorandum dated October 2, 1980) states: "Since the gross amount [of the wraparound mortgage] includes such interest *upon prepayment of the Wraparound Mortgage in full,* the partnership would be entitled to a credit against (or rebate on account of, if the full amount is paid) the total interest included in the gross amount. Such credit (or rebate, as the case may be) shall be in an amount equal to the unaccrued portion of the total interest computed on the basis of the Rule of 78's." (emphasis added).

that was prepared for Quincy by retained counsel. Defendant's Ex. 6, A67 and Ex. D, A297, respectively. (*See* Appendix for relevant provisions.) All such data was made available to prospective purchasers of an interest in Quincy. Thus, prior to investing an interest in the partnership, the taxpayers were made aware through said disseminated data of the numerous risks associated with the tax sheltering partnership venture proposed by Quincy.

Specifically, relevant to certain issues herein, we find that the plaintiffs were, as a consequence, directly advised or on notice that: (i) use by Quincy of the Rule of 78's method of calculating interest expense deductions was one of the primary features of the offering that made it an attractive tax shelter opportunity; (ii) the laws regarding the proposed use of the Rule of 78's method were not clearly developed and, indeed, there was *no authority* permitting the use of the Rule of 78's method in a situation such as that proposed by the Quincy partnership venture; (iii) the Internal Revenue Service (IRS) had instituted an aggressive contra tax shelter audit program; (iv) such program was geared to flag partnership returns that reported losses in excess of $25,000.00; (v) Quincy hoped to realize losses far in excess of the $25,000.00 audit minimum, therefore, its potential risk of audit was significantly enhanced; (vi) because application of the Rule of 78's method to interest expenses deducted for tax purposes resulted in a far greater proportion of debt service in the early years being treated as deductible interest rather than nondeductible principal, the IRS could contend that use of that method did not clearly reflect income under Internal Revenue Code section 446(b); (vii) if the IRS determined that the use of the Rule of 78's method by Quincy did not clearly reflect income, "the tax benefits expected to be derived from ... [the] investment ...

[could] be reduced or eliminated." Notwithstanding the aforementioned obvious risks, *supra,* the taxpayers invested in the Quincy partnership.

Following thereon, and during taxable years 1981 and 1982, Quincy reported accrued deductible interest expense, which amounts were calculated under the Rule of 78's as follows: 1981, $417,604.00; and 1982, $399,078.00. Said amounts, which substantially exceeded Quincy's actual total payments (*i.e.,* of principal *and* interest) on the wraparound mortgage *for each of said taxable years,* were deducted on Quincy's partnership tax return.[13] Mulholland, of course, during taxable years 1981 and 1982, likewise reported his distributive share of the foregoing interest expense, *i.e.,* $7,827.00 and $7,480.00, respectively, on his joint personal income tax returns. At issue in the instant matter, therefore, are the interest deductions reported by the Mulhollands on their 1981 and 1982 joint personal income tax returns.[14]

In that connection, on or about September 13, 1983, the Internal Revenue Service (hereinafter the Service) initiated an audit of all FDI Financial Corporation sponsored partnerships (including Quincy) that employed the Rule of 78's method to calculate and accrue interest expense deductions for federal income tax reporting purposes. This audit was conducted primarily because of the issuance by the Service of Rev.Rul. 83–84, on June 6, 1983, wherein the Commissioner held that the Rule of 78's was *not* an acceptable method of computing and reporting interest expense because it did not reflect the true cost of borrowing within certain periods; and thus, the effect of same did *not* clearly reflect income under section 446(b) of the Internal Revenue Code. *See* Rev.Rul. 83–84, 1983–1 Cum. Bull. 97. Thereafter, on September 14,

---

**13.** During calendar year 1981, Quincy made actual total payments on the wraparound mortgage totalling $385,000.04. Therefore, Quincy's taxable year 1981 *actual total payments (i.e.,* principal and interest) were $32,603.96 *less* than the *interest deducted for the taxable year.* Similarly, during calendar year 1982, Quincy made actual total payments on the wraparound mortgage totalling $379,000.04. However, Quincy's

taxable year 1982 *actual total payments* were $20,077.96 *less* than the *interest deducted for said taxable year.* Defendant's Appx. B, p. 41.

**14.** The focus of the complaint, however, purports to challenge the Commissioner's determination as it relates to Quincy's deductions.

1983, the examining revenue agent (Hudak) submitted an appointment letter to the FDI tax manager preliminary to scheduling his audit. At that time, Hudak also contemporaneously delivered an information and document request notice. Therein he requested, *inter alia,* "copies of the partnerships' tax returns for 1981 and 1982, copies of the partnerships' mortgage indebtedness and appropriate amortization schedules, and copies of any other indebtedness documents, ... *needed to verify claimed interest deductions.*" Defendant's Ex. 1, A2.

Later, on October 7, 1983, the FDI tax manager sought a postponement of said examination because FDI was considering requesting an administrative reconsideration of Rev.Rul. 83–84. The agent did not, however, postpone examination of the returns. It is unclear from the record whether such administrative reconsideration was ever initiated by FDI.

The audit continued, and focused on the *verification* of the partnership's interest deductions. By letter dated January 29, 1985, FDI was notified by the Service that the reviewing Revenue Agent had determined (on September 12, 1984) that the interest deductions taken by Quincy (and thus the tax-paying partners) exceeded that amount permissible under Rev.Rul. 83–84 in that such deductions were in excess of that which could be said to have "economically accrued" on subject mortgage for taxable years 1981 and 1982.[15] Because it was

the Commissioner's position that interest expenses claimed in excess of economically accrued interest were not deductible for federal income tax reporting purposes, the partnership's interest expense deductions were, accordingly, adjusted downward to the extent of $195,000.00 for taxable year 1981 and $165,663.00 for taxable year 1982. The balance, therefore, from the Commissioner's judgment, represented deductible economically accrued interest which caused taxable income to be clearly reflected.

Plaintiffs' distributive share of the adjustment consequently resulted in the additional tax assessment by the Commissioner (on or about March 25, 1985) to their joint personal income as follows: taxable year 1981, $1,781.00 tax, plus $881.21 in deficiency interest; and taxable year 1982, $1,866.00 tax, plus $351.20 in deficiency interest. Plaintiffs paid the additional assessments in April 1985. On June 14, 1985, the taxpayers filed timely administrative refund claims with the Internal Revenue Service Center, Philadelphia, Pennsylvania. Subject refund claims were denied on or about October 17, 1985. Shortly thereafter, on October 30, 1985, plaintiffs commenced the instant action in this court.

CONTENTIONS ON SUMMARY JUDGMENT

The parties have cross-moved for *partial* summary judgment, addressing only the claims presented in plaintiffs' Count II and Count III. Count I is, therefore, not currently before the court.[16] The contentions

---

**15.** Economic accrual is the operative phraseology used in Rev. Rul. 83–84. Therein it is defined as the "true cost" of indebtedness *for a given period.* That is to say, the true cost of indebtedness is the "effective rate of interest, which is a uniform rate over the term of the loan and is based on the amount of the loan and the repayment schedule provided in the loan agreement when applied to the unpaid balance of the indebtedness for a given period...."

**16.** The court notes, however, that in earlier pleadings, both parties were of the opinion that resolution of Count II in favor of the *plaintiffs* would, of necessity, moot both Counts I and III. Subsequently, in its reply brief, defendant retracted its prior position and argued that resolution of Count II in favor of the plaintiffs would *not ipso facto* entitle the plaintiffs to the refund herein requested.

As will be explained *infra,* the court is inclined to agree with defendant's above-stated assertion. However, the same holds true if the court were to find in favor of *defendant* on Count II. Count II merely challenges (i) the propriety of retroactive application of Rev. Rul. 83–84 to interest accruing on notes and loan transactions entered into on or after June 6, 1983, and (ii) whether the Commissioner properly excluded a group of taxpayers from its provisions; nothing more, nothing less. This is a question of law resolvable on summary judgment.

Notwithstanding our ability to resolve Count II as pleaded by the plaintiffs, we note that there will remain a *factual question, i.e.,* whether the Commissioner erred in determining that the plaintiffs' interest deductions did not "clearly reflect" income under 26 U.S.C. § 446(b), a *per se* determination under Rev.Rul. 83–84

of the parties, under each count, are set forth below.

## I. *Count II*

### A. Defendant

On motion, the defendant asserts that because revenue rulings generally apply retroactively to the date of enactment of the statute to which they relate, the plaintiffs are compelled to demonstrate, but cannot, that the Commissioner abused his discretion in deciding *not* to prescribe prospective only application of Rev.Rul. 83–84.

Moreover, defendant contends that the Commissioner did *not* arbitrarily retroactively apply Rev.Rul. 83–84 to some taxpayers while simultaneously exempting similarly situated taxpayers. Defendant bases its assertion on the fact that the administrative exception, *i.e.* Rev.Proc. 83–40,[17] applies only to short-term consumer loans, not long-term real estate mortgages such as that executed by Quincy. Accordingly, defendant asks that the court grant its motion for partial summary judgment with respect to Count II, and that such count be dismissed with prejudice.

### B. Plaintiffs

On the other hand, plaintiffs assert that the Commissioner abused his discretion under section 7805(b) of the Internal Revenue Code when he: (i) failed to prescribe prospective only application of Rev.Rul. 83–84; and (ii) simultaneously exempted a group of taxpayers from its provisions.

In furtherance thereof, plaintiffs contend that the *rationale* of Rev.Rul. 83–84 does not require retroactive application simply because the ruling indicates that the method of accounting for interest expense therein is the economic accrual of interest concept (*see* note 15, *supra*). Plaintiffs allege

that the economic accrual concept finds no support whatsoever in the law of federal income taxation *prior* to the enactment of the Tax Equity and Fiscal Responsibility Act of 1982, P.L. 97–248 (TEFRA). TEFRA, plaintiffs assert, introduced the economic accrual concept into the Internal Revenue Code on a prospective only basis. Accordingly, they argue that the Commissioner's failure to likewise prospectively enforce the rationale of Rev.Rul. 83–84 (which embraces the economic accrual concept), while at the same time excluding a group of taxpayers from its provisions (*i.e.*, those holding short-term consumer loans), is an arbitrary application of the tax laws and produces inequitable results. Therefore, plaintiffs contend that judgment should be entered in their favor on Count II.

## II. *Count III*

### A. Defendant

As to this count, defendant contends that Quincy is not entitled to use the procedures specified under Rev.Proc. 84–28 because an issue, concerning Quincy's deductible amount of reported interest expense, had been raised by, and was pending before, the Internal Revenue Service on or before *April 2, 1984*, in connection with the examination of its 1981 and 1982 federal tax returns.

### B. Plaintiffs

Conversely, plaintiffs proffer that, although Quincy was notified in *September 1983* that its 1981 and 1982 tax returns would be examined, it was not formally informed by the examining agent until May 24, 1984, that he required documents to substantiate the partnership's interest deductions. Furthermore, plaintiffs contend

---

when interest is calculated under the Rule of 78's. Said issue was preserved by the parties for trial on the merits due to their failure to raise it on summary judgment. Consequently, as discussed *infra,* the remaining factual questions of Count I will have to be resolved in a trial on the merits.

**17.** Rev.Proc. 83–40 provides that, as a matter of convenience, the Service will accept the Rule of

78's method of computing a borrower's interest deductions if: (1) the loan is a self-amortizing consumer loan; (2) the loan requires level payments; (3) the loan does not exceed five years; (4) the loan does not call for a balloon payment at the end of the loan term; and (5) the loan agreement provides that interest is earned in accordance with the Rule of 78's method. Rev. Proc. 83–40, 1983–1 Cum. Bull. 775.

that the Service did not *notify* Quincy of the revenue agent's proposed changes to the partnership's interest calculations until January 1985. Plaintiffs thus contend that the issue regarding the propriety of the interest expense calculation had not been "raised," as required, in a legal sense on or before April 2, 1984. Therefore, they conclude that Quincy should not be precluded from use of the favorable provisions contained in Rev.Proc. 84–28.

ISSUES

Sharply drawn, the issues raised by the foregoing cross-motions for partial summary judgment are as follows. Count II presents two narrow questions of law—(i) whether the Commissioner's failure to prescribe prospective only application of the *rationale* of Rev.Rul. 83–84 was an abuse of his section 7805(b) discretion; and (ii) whether the Commissioner's decision to exempt a certain group of taxpayers from operation of Rev.Rul. 83–84 (*i.e.,* those who hold short-term consumer loans) resulted in the arbitrary application of his authority under section 7805(b). Finally, Count III poses the question—whether an issue regarding the use of the Rule of 78's method of accounting had been raised with the taxpayers and was pending before the Service on or before April 2, 1984. Inasmuch as we conclude, *infra,* that plaintiffs fail to demonstrate that the Commissioner abused his section 7805(b) discretion as challenged in Count II, we GRANT defendant's and DENY plaintiffs' respective motions for partial summary judgment thereunder, and dismiss that count with prejudice. However, we find that relevant to Count III, genuine issues of material fact remain unresolved. Accordingly, we DENY both the defendant's and the plaintiffs' cross motions for partial summary judgment postured under Count III.[18]

PRELIMINARY MATTERS

*Burden of Proof*

■ It is axiomatic that in the context of a tax refund suit, the Commissioner's determination is deemed to be presumptively correct. *See Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Puritan Lawn Memorial Park Cemetery v. United States,* 15 Cl.Ct. 234, 240 (1988); *U.S. Shelter Corp. v. United States,* 13 Cl.Ct. 606, 621–22 (1987). While generally under section 163(a) of the 1954 Internal Revenue Code, "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness," 26 U.S.C. § 163(a) (1988), it is well settled that deductions are not a matter of right, but are a matter of legislative grace. *See Commissioner of Internal Revenue v. Sullivan,* 356 U.S. 27, 28, 78 S.Ct. 512, 513–514, 2 L.Ed.2d 559 (1958); *Interstate Transit Lines v. Commissioner of Internal Revenue,* 319 U.S. 590, 593, 63 S.Ct. 1279, 1281, 87 L.Ed. 1607 (1943); *Iowa Southern Utilities Co. v. United States,* 841 F.2d 1108, 1113 (Fed.Cir.1988); *Massachusetts Mutual Life Insurance Co. v. United States,* 5 Cl.Ct. 581, 584 (1984), *aff'd,* 761 F.2d 666 (Fed.Cir.1985). Thus, Congress can disallow deductions as it chooses, *Sullivan, supra,* 356 U.S. at 28, 78 S.Ct. at 513–514, and "the burden is on the taxpayer[s] to prove that [they are not only] entitled to ... [deduct a certain category of expenditures but also are entitled to deduct the amount claimed]." *Massachusetts Mutual Life Insurance, supra,* at 584, *citing to, Interstate Transit Lines,* 319 U.S. at 593, 63 S.Ct. at 1281. Stated differently, the burden of proof in the instant tax refund suit rests with the taxpayers to establish its entitlement to the amounts claimed. *Welch,* 290 U.S. at 115, 54 S.Ct. at 9; *U.S. Shelter,* 13 Cl.Ct. at 621.

As contended, with regard to Count II, defendant, the original moving party, asserts that because revenue rulings generally enjoy retroactive effect, the plaintiffs are also compelled to demonstrate an abuse of section 7805(b) discretion. Plaintiffs, on the other hand, assert as a ground for their cross-motion, that the Commissioner abused his section 7805(b) discretion in failing to prescribe prospective only applica-

---

**18.** The court also notes that Count III (as well as Count I) appears to challenge the Commissioner's determination in terms of additional tax assessments, and failure to permit the use of Rev. Proc. 84–28.

tion for the *rationale* of Rev.Rul. 83–84, while simultaneously excluding a group of taxpayers from its concepts.

■ Of course, in order to grant *either* party's summary judgment motion, we must first determine that "there are [no] genuine issues of material fact and that the prevailing moving party is entitled to judgment as a matter of law." *Precision Specialty Corporation v. United States*, 15 Cl.Ct. 1, 4–5 (1988), *citing to, Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *and, Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560 (Fed.Cir.1987). These principles are refined somewhat, however, where the moving party (*i.e.*, defendant herein) will not bear the initial burden of proof at trial. *See Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 299–300 (1988). In such instance, such as a tax refund suit, where the taxpayer (the non-moving party) bears the initial burden of proof that the Commissioner's determination is incorrect, *Welch*, 290 U.S. at 115, 54 S.Ct. at 9, " 'the burden of the moving party may be discharged by "showing" ... that there is an absence of evidence to support the nonmoving party's case.' " *Big Chief Drilling*, 15 Cl.Ct. at 299, *citing to, Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554.

Thus, in order to win on its motion, the defendant need only demonstrate that there is an absence of evidence to support the plaintiffs' case *relevant to an abuse of the Commissioner's section 7805(b) authority*. On the other hand, in order for plaintiffs to prevail under Count II, they must demonstrate, as a matter of law, that the Commissioner abused his section 7805(b) discretion: (i) in failing to prescribe prospective only application for Rev.Rul. 83–34; and (ii) in exempting holders of short-term consumer loans from the provisions thereof.

With these principles in mind, we will proceed as follows. First we will define the limited scope of this court's opinion, necessitated by our conclusion that section 446(b) issues implicitly raised by the parties under Count I encompass genuine issues of material fact, thus precluding summary relief at this time. We will then discuss the merits of each party's motion relative to Counts II and III, seriatim.

SCOPE OF THIS COURT'S OPINION

At the outset, we reiterate, in addressing the parties' cross-motions, that plaintiffs' complaint is framed in *two alternatively plead counts* to their primary count. Count I charges that the Commissioner erred in holding that Quincy was not entitled to deduct interest expenses calculated under the Rule of 78's method. Alternatively, Count II accuses the Commissioner of abuse of discretion in failing to apply the rationale of Rev.Rul. 83–84 prospectively only, and in omitting short-term consumer loans from its provisions. Finally, Count III (alternatively) alleges that the Commissioner erred in denying plaintiffs the benefits of Rev.Proc. 84–28.

Defendant's motion raises issues only with regard to Counts II and III. Similarly, plaintiffs' motion only addresses Counts II and III. The court reemphasizes that Count I, the primary count, is not currently before us. We therefore deem the parties' failure to include such count for summary disposition to be a tacit admission that said count raises genuine issues of material fact. Thus, issues contemplated by Count I are preserved for a trial on the merits.[19]

Notwithstanding the fact that Count I is not currently before us, looking to the complaint as a whole, we find it necessary to punctuate our discussion by observing that Count I is the *only* count within the complaint whereunder, if successful, plaintiffs could obtain the monetary relief sought, *i.e.*, a refund of the tax assessments in question. This is so because even assuming, *arguendo*, plaintiffs were to prevail

---

**19.** Count I essentially challenges the propriety of the Commissioner, pursuant to his § 446(b) authority, determining that Quincy's use of the Rule of 78's method of accounting for interest expense did not clearly reflect income to the

extent that it exceeded the "economic accrual" of interest. A finding for plaintiffs under this count would entitle them to a refund of the additional taxes assessed.

under Count II, that count in essence merely questions the propriety of retroactive application of Rev.Rul. 83–84. In order to prevail on the merits, the plaintiffs' burden here is *not only* to demonstrate an abuse of discretion in the retroactive application of Rev.Rul. 83–84, they must also show that the Commissioner's initial determination that their method of accounting did not clearly reflect income under section 446(b), was erroneous and illegal. It is of paramount importance, therefore, that we remember that it is this *initial* determination (*i.e.*, that income was not clearly reflected) that prompted the Commissioner's *application* of the method of accounting enunciated in Rev.Rul. 83–84, and resulted in the *additional tax assessment.* The anomaly here is that the Commissioner's initial section 446(b) determination, however, is not presently before the court with respect to the parties' cross-motions. We, therefore, will proceed to discuss the limited issues raised under Counts II and III.

DISCUSSION

I. *Count II*

As noted, Count II challenges—(i) the Commissioner's decision to retroactively (rather than prospectively) apply Rev.Rul. 83–84; and (ii) the propriety of his decision to exempt a category of taxpayers from its operation; nothing more, nothing less. Prior to addressing the parties' arguments, therefore, we first observe the principles enunciated in subject revenue ruling.

The Commissioner, in Rev.Rul. 83–84, definitively answered the threshold question: "What is the proper *method of accounting* for interest [deduction] on indebtedness when the *terms of that indebtedness* state that interest is earned in accordance with the Rule of 78's computation?" Rev.Rul. 83–84, 1983–1 Cum.Bull. 97 (emphasis added). The Rule of 78's method, as previously noted, *supra*, note 2, is simply a mechanical formula for calculating and allocating interest deductions to time periods during the life of a loan. In the Commissioner's opinion, application of the Rule of 78's to long-term notes almost always results in the acceleration of interest recognition during the *early* years of the loan, and conse-

quently, produces interest expense that materially distorts the true cost of borrowing for such period in question. *See* note 2, *supra.*

Against this background, and relying upon the section 446(b) spawned premise, that *no method of accounting* for interest *is acceptable unless* the Commissioner concludes that *it clearly reflects income,* the Commissioner adopted the position in Rev. Rul. 83–84. Therein, it is provided that, regardless of the agreement between the parties to the contrary, the "substance of a loan agreement [shall be] that the *same rate of interest* applies to *each taxable year of the loan....*" Rev.Rul. 83–84 (emphasis added). Accordingly, the Commissioner determined that the only method for determining the rate "charged for the use or forbearance of money" (*i.e.*, interest) is one which reflects the effective rate of interest as applied to the unpaid balance of the loan over a given period.

This "effective rate of interest"—defined as the measure of the cost of credit, and expressed as a yearly uniform rate "applied to the unpaid loan balance of the indebtedness for a given period"—became the benchmark by which the Commissioner ostensibly could determine the true cost of indebtedness for a given period. This cost was euphemistically coined the "economic accrual" of interest. Supposedly, the economic accrual method of accounting for interest was designed to relate the *amount and timing of values received to the timing of payments made. See* Rev.Rul. 83–84, 1983–1 Cum.Bull. 98. Consequently, the holding of Rev.Rul. 83–84, relevant to accrual method taxpayers such as Quincy, is that no deduction would be allowed to the extent that the amount of the taxpayer's (debtor's) *accrual* exceeds interest that does not reflect the true cost of borrowing for any given period.

As hereinbefore noted, each party has zealously advanced its arguments, for and against, regarding the propriety of the retroactivity of Rev.Rul. 83–84. The defendant stands behind its assertion that the Commissioner did not abuse his section 7805(b) discretion because revenue rulings

as a general rule apply retroactively. The plaintiffs, on the other hand, believe section 7805(b) discretion was abused: (i) because the "economic accrual" concept did not exist prior to the enactment of TEFRA in 1982; and also (ii) because the Commissioner arbitrarily excluded a group of taxpayers from the ruling's operation. An overview of the Commissioner's authority pursuant to section 7805 follows.

Under 26 U.S.C. § 7805(a),[20] Congress empowered the Secretary of the Treasury or his delegate (*e.g.*, the Commissioner) to prescribe all needful rules and regulations for the enforcement of the Internal Revenue laws. 26 U.S.C. § 7805(a); Treas.Reg. 301.7805–1(a). Such rules and regulations are presumptively retroactive to the date of enactment of the statute to which they relate *unless* the Commissioner prescribes otherwise. 26 U.S.C. § 7805(b); Treas. Reg. 301.7805–1(b); *Anderson, Clayton & Co. v. United States*, 562 F.2d 972, 979 (5th Cir.1977), *cert. denied*, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978); *Kaiser Cement Corp. v. United States*, 8 Cl.Ct. 34, 39–40 (1985). Thus, although Rev.Rul. 83–84 does not expressly state whether it is to have retroactive effect, in the absence of limitations imposed by statute or regulations, this court is compelled to presume (until the plaintiffs offer probative evidence to the contrary) that it has been properly retroactively applied. *Accord Anderson, Clayton*, 562 F.2d at 979.

▆▆▆ In this connection, because the Commissioner has the discretion to determine the extent to which his rulings will be retroactively applied, his implicit decision not to specifically prescribe prospective only application for Rev.Rul. 83–84 may *only* be reviewed by this court for an abuse of discretion. *See generally Dixon v. United States*, 381 U.S. 68, 74–76, 85 S.Ct. 1301, 1305–06, 14 L.Ed.2d 223 (1965); *Automobile Club of Michigan v. Commissioner of Internal Revenue*, 353 U.S. 180, 184, 77 S.Ct. 707, 709–10, 1 L.Ed.

2d 746 (1957); *Anderson, Clayton & Co.*, 562 F.2d at 979; *Manocchio v. Commissioner of Internal Revenue*, 710 F.2d 1400, 1402 (9th Cir.1983); *Wilson v. United States*, 588 F.2d 1168, 1171–72 (6th Cir. 1978). Thus, in the instant matter, an abuse of discretion can be inferred, and we may refuse to sanction retroactive application of Rev.Rul. 83–84, only *if* plaintiffs demonstrate by a preponderance of the uncontroverted evidence that one of the following situations exist:

1) retroactivity would work a *change* in settled law *relied* upon by the taxpayers and implicitly approved by Congress, *Helvering v. R.J. Reynolds Tobacco Co.*, 306 U.S. 110, 116, 59 S.Ct. 423, 426, 83 L.Ed. 536 (1939);

2) application of Rev.Rul. 83–84 leads to inequality of treatment between competitor taxpayers, *International Business Machine Corp. v. United States*, 170 Ct.Cl. 357, 343 F.2d 914 (1965), *cert. denied*, 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966); or

3) in general, the results of retroactivity in this case would be unduly harsh, *Woodward v. United States*, 322 F.Supp. 332, 335 (D.Va.1971), *aff'd*, 445 F.2d 1406 (4th Cir.1971)

(as set forth in *Anderson, Clayton, supra*, at 981).

Considerations relevant to our inquiry concerning the propriety of effecting retroactivity of Rev.Rul. 83–84, based upon the above-cited factors, are: (i) whether or to what extent the taxpayers *justifiably* relied on prior settled law or regulatory policy, and whether or to what extent, if any, the putatively retroactive regulation alters that law; (ii) the extent, if any, to which the prior law or regulatory policy has been implicitly approved by Congress through legislative reenactment of the pertinent code provisions; (iii) whether retroactive application of the rule would advance or frustrate equality of treatment

---

**20.** 26 U.S.C. § 7805(a) provides in relevant part: "Authorization.—Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary or his delegate shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue."

among similarly situated taxpayers; and, finally, (iv) whether according retroactive effect would produce an inordinately harsh result. *Anderson, Clayton,* 562 F.2d at 981. In light of these focused considerations, we will next address the relevant factors, seriatim.

### 1. *Does Retroactivity Implement A Change In Settled Law Relied Upon By The Taxpayers?*

In support of their affirmative contentions, plaintiffs have inundated this court with a plethora of citations to numerous revenue rulings and tax law, all of which do little, if anything, to advance the burden they must meet. Moreover, substantially identical arguments and citations were made to the Tax Court recently by the petitioners (who also were limited partners with plaintiffs in Quincy during the tax years herein in question) in the case *Prabel v. Commissioner of Internal Revenue,* 91 T.C. No. 71 (Dec. 29, 1988). Inasmuch as the Tax Court pointedly synthesized the relevant rulings and case law, *i.e.,* that which the plaintiffs *herein* claim also to have relied upon, we will briefly discuss that court's opinion.[21]

Relying primarily upon the identical operative factual setting involved in the instant action, the Tax Court in *Prabel* determined, *inter alia,* that the Commissioner had properly retroactively applied Rev.Rul. 83–84, and further, that it had properly excepted holders of *short-term* consumer loans from its operation. *Prabel, supra,* slip op. at 30–41. Although the Tax Court prefaced its discussion with a caveat indicating that the Commissioner could have imposed economic accrual upon the petitioners (in place of the Rule of 78's), pursuant to his authority under section 446(b), it concluded that there simply existed *no* legal authority upon which Quincy Associates' professional advisors could reasonably have relied, in support of their decision to accrue and expense interest under the Rule of 78's method. We agree be-

cause we find the Tax Court's analysis on this point to be persuasive.

Corroborative of the foregoing, we find Quincy's October 2, 1980 Offering Memorandum to be decisive of the foregoing issue. As previously noted, and pertinent herein, the Offering Memorandum forcefully warned prospective investors specifically that:

- "[T]he law in this area is not clearly developed. Accordingly there can be no assurance that IRS will not contend that use of the Rule of 78's method by the Partnership does not clearly reflect its income ...; and * * *
- *[t]here is no authority* specifically approving the use of such method in a transaction similar to this case."

Based upon the clear language in the Offering Memorandum, and the fact that there simply was no legal authority upon which Quincy investors reasonably could have relied to support the partnership's decision to use the Rule of 78's method, given said pre-purchase admonishment, we will not now permit plaintiffs to tenuously assert that they relied upon "settled law" that permitted the use of the Rule of 78's method in deducting interest on a long-term purchase money wraparound mortgage. It is clear beyond cavil that none existed. Accordingly, plaintiffs fail to meet their burden under the first factor and are not entitled to relief thereunder.

### 2. *Is There Inequality Of Treatment Between Competitor Taxpayers?*

Resolution of this factor requires only short-shrift. Apparently, to meet this test, plaintiffs rely upon the Commissioner's administrative exception to his bar on the use of the Rule of 78's method of accounting for interest contained in Rev.Proc. 83–40. Under that procedure, the Service will *permit* the use of the Rule of 78's method for computing a borrower's interest deductions as a matter of convenience if, and only if:

---

**21.** However, we note that the court in *Prabel* also decided issues relevant to the Commissioner's authority under section 446(b). Without commenting upon the merits of the court's analysis thereunder, we once again emphasize that in the case at bar all section 446(b) issues have been preserved under Count I and are, therefore, not currently before this court.

i. The loan is a consumer loan that is self amortizing and requires level payments at regular intervals;

ii. Such loan does *not* exceed five (5) years;

iii. There is no balloon payment at the end of the loan term; *and*

iv. The loan agreement provides that interest is earned (or upon prepayment of the loan, is treated as earned) in accordance with the Rule of 78's method.

Rev.Proc. 83–40, 1983–1, Cum.Bull. 775.

These elements are stated in the conjunctive, therefore, plaintiffs must fulfill each requirement (*i.e.*, meet every element) in order to establish a *prima facie* showing that the Commissioner acted arbitrarily and abused his authority under section 7805(b) in treating competitor taxpayers differently. Factually, plaintiffs have not and cannot accomplish this elementary requirement.

First, plaintiffs' loan is not a consumer loan. But rather it is a purchase money wraparound mortgage set up to self amortize (if a balloon payment is made) in 23 years. Secondly, the loan term is 23 years (versus 5 years), and there *is* a balloon payment of $1,889,249.00 at the end of the loan term. Thus, there is simply no similarity between the Quincy loan and a typical excepted consumer loan as contemplated by Rev.Proc. 83–40. Plaintiffs fail, therefore, to even minimally estabish inequality of treatment between *competitive* taxpayers. Thus, the difference in treatment accorded each loan can be rationally and legally distinguished. *Accord Dixon v. United States*, 381 U.S. at 75–80, 85 S.Ct. at 1305–08.

Notwithstanding the disparity in treatment between short-term consumer loans and long-term loans, such as Quincy's, the Commissioner's differential treatment will be upheld if, as in the instant case, a rational basis supports his decision. *Dixon*, 381 U.S. at 78–80, 85 S.Ct. at 1307–08; *International Business Machines Corp. v. United States*, 170 Ct.Cl. 357, 343 F.2d 914, 920–21 (1965), *cert. denied*, 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966). "On

this record, we cannot say that [such] distinction was so devoid of a rational basis that we must now overturn the Commissioner's judgment." *Dixon*, 381 U.S. at 79, 85 S.Ct. at 1307–08. Accordingly, we are constrained to find that plaintiffs' bare allegation, that the treatment afforded their long-term loan versus that afforded short-term consumer loan holders, is without merit.

### 3. Are The Results Of Retroactivity Unduly Harsh?

Finally, as to this factor, we note that the plaintiffs have completely failed to demonstrate, factually or otherwise, that retroactive application of Rev.Rul. 83–84 would be *unduly* harsh on the facts here. At best, we have their bland assertion that, conceptually, the economic accrual method did not surface until *after* the enactment of TEFRA in 1982. This fact alone is insufficient to warrant relief, however, because the plaintiffs were *explicitly* pre-warned by Quincy's legal and tax advisors that there was *no authority* permitting use of the Rule of 78's method; and, if the Service determined that the use of this method did not clearly reflect income, the tax benefits expected to be derived from the investment could be reduced or totally eliminated. *See* Appendix.

Therefore, we find that the Commissioner's decision to apply Rev.Rul. 83–84 retroactively did not result in unduly harsh treatment to the taxpayers. Accordingly, the Commissioner did not abuse his discretion under section 7805(b) when he retroactively applied Rev.Rul. 83–84.

### Summary—Count II

We noted that the Commissioner either implicitly or overtly followed a series of steps prior to reaching his decision to apply Rev.Rul. 83–84 to Quincy. First, the Commissioner necessarily had to *determine that Quincy's income was not clearly reflected by the method of accounting employed*, as required by § 446(b). Method of accounting, as contemplated herein, encompasses not only the overall accounting treatment utilized by a taxpayer (*e.g.*, cash basis, accrual, or some hybrid method thereof), but *also* the accounting treatment

of any particular individual item, such as interest, inventories, or depreciation. Treas.Reg. § 1.446–1(a) (1984); *B.A. Ballou & Co., Inc. v. United States,* 7 Cl.Ct. 658, 661, *aff'd,* 785 F.2d 325 (Fed.Cir.1985); *accord Burck v. Commissioner of Internal Revenue,* 533 F.2d 768, 773 (2d Cir. 1976), *aff'g,* 63 T.C. 556 (1975). As noted, *supra,* the propriety of that action relative to the merits is raised under Count I and is, therefore, *not* currently before us.

Secondly, upon determining that the method of accounting employed by Quincy, during the years in issue, did not clearly reflect income, the Commissioner, of course, had to *choose a method which did in fact clearly reflect income.* 26 U.S.C. § 446(b); *see Loftin & Woodard v. United States,* 577 F.2d 1206, 1229 (5th Cir.1978). In his selection, *supra,* the Commissioner, as a general proposition, was free to choose *whatever* method *in his opinion* clearly reflected Quincy's income. *B.A. Ballou,* 7 Cl.Ct. at 661; *accord A & A Tool Supply Co. v. Commissioner of Internal Revenue,* 182 F.2d 300, 305 n. 1 (10th Cir.1950). Thus, without regard to whether or not Rev.Rul. 83–84 had in fact been promulgated, the Commissioner could nevertheless have chosen the economic accrual method under his section 446(b) discretionary authority. However, despite said broad authority to adopt such an appropriate method of accounting, the Commissioner's action will be set aside by the courts if there is a clear abuse of section 446(b) discretion, *Thor Power Tool, Co. v. Commissioner,* 439 U.S. 522, 532–33, 99 S.Ct. 773, 780–81, 58 L.Ed.2d 785 (1979); *Cole v. Commissioner of Internal Revenue,* 586 F.2d 747, 749 (9th Cir.1978), *citing to, Lucas v. Kansas City Structural Steel Co.,* 281 U.S. 264, 271, 50 S.Ct. 263, 266, 74 L.Ed. 848 (1930); *Sandor v. Commissioner of Internal Revenue,* 536 F.2d 874, 875 (9th Cir.1976) (per curiam), *or* if such action is "plainly arbitrary." *Thor Power Tool,* 439 U.S. at 533, 99 S.Ct. at 781; *Sandor,* 536 F.2d at 875. The propriety of this action is also raised in the context of Count I and, therefore, not currently before us.

It is at the point where the Commissioner was *selecting* a proper method of accounting for deductible interest expense (*i.e.,* because the Rule of 78's method did not clearly reflect income) that Rev.Rul. 83–84 came into play. This is necessarily true because, as stated, Rev.Rul. 83–84, by its terms, merely establishes "the proper method of accounting for interest expense on indebtedness." Rev.Rul. 83–84, 1983–1 Cum.Bull. 97.

Based upon the foregoing discussion, we find as a matter of law, that there was no evidence of an abuse of discretion in the Commissioner's decision to retroactively apply Rev.Rul. 83–84. Further, we find as a matter of law that the defendant has demonstrated that there is an unequivocal absence of evidence to support the plaintiffs' case under Count II. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. Accordingly, we GRANT defendant's motion for partial summary judgment on Count II of the complaint, and concurrently DENY plaintiffs' motion for partial summary judgment thereunder.

*Count III*

■ Finally, for the reasons expressed below, we deny each party's cross-motion for summary judgment with respect to the issue(s) raised under Count III. We are compelled to so rule because we find that there are genuine issues of material fact precluding summary relief. *See Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

In connection with Count III, defendant claims that an issue regarding the partnership's interest calculations had been "raised" and was "pending" before the Service *on or before April 2, 1984.* § 3.08, Rev.Proc. 84–28. Because of this alleged circumstance, it further contends that the plaintiffs are, as a consequence, *not* entitled to the benefit of the procedures outlined in Rev.Proc. 84–28, *infra.* On the other hand, the plaintiffs strenuously assert that such issue (the propriety of determining the amount of the interest deduction pursuant to the Rule of 78's method) had *not* been "raised" (nor was such "pending") in a legal sense on or before the operative date, April 2, 1984. Accordingly, plaintiffs assert that they should not be

precluded from utilizing the procedures and obtaining the benefits inuring from Rev.Proc. 84–28. Logically then, given the issues postured, our inquiry must begin with an understanding of what is meant by "raised" as contemplated in Rev.Proc. 84–28.[22]

Rev.Proc. 84–28 was promulgated by the Commissioner to "provide a mandatory procedure for taxpayers to change their method of accounting for interest on indebted-. ness when they [had] been reporting interest income or deductions in accordance with the Rule of 78's" method. Rev.Proc. 84–28, 1984–1 Cum.Bull. 475. The procedure prohibits its benefits from being realized by "a *lender* or *borrower* ... if an issue concerning the amount of reported interest income or claimed interest deduction [had] been *raised and* [was] *pending* on April 2, 1984, in connection with the examination of *the taxpayer's* federal income tax return." Rev.Proc. 84–28, *supra* (emphasis added).

If a taxpayer qualifies, that is, if an issue regarding its use of the Rule of 78's has *not* been "raised" and was *not* pending before the Service on April 2, 1984, the following benefits are conferred thereon by the Commissioner pursuant to § 3, Rev. Proc. 84–28:

a) The requirement that the taxpayer file an application for consent to change its method of accounting within 180 days after the beginning of the tax year in which it desires to make such change is waived;

b) consent is automatically granted to the taxpayer to change its method of accounting from the Rule of 78's to economic accrual; and

c) such consent is granted for the first tax year ending on or after December 31, 1983.

Compliance with this procedure necessitates an adjustment to income (called a section 481(a) adjustment) which precludes

income and deductions from being duplicated within the meaning of section 481 of the Code. The section 481(a) adjustment is taken into account when computing taxable income. If, as in the instant case, such adjustment results in an increase in taxable income, the procedure permits the taxpayer to take such into account:

1) Ratably over three years if the adjustment would have been allocated over four through six years;

2) Ratably over two years if the adjustment would have been allocated over three years; or

3) Ratably over one year if the adjustment would have been allocated over one or two years.

——— Taxes 312, 319, *The Rule of 78's in Light of Revenue Ruling 83–84* (April 1985). Nonetheless, as previously indicated, in order to take advantage of these procedural benefits, an issue regarding the use of the Rule of 78's must not have been raised with the taxpayer on or before April 2, 1984.

*Webster's Dictionary* defines the word "raised" to mean—"to put forward for consideration." *See Webster's II New Riverside University Dictionary* 972 (1984). Thus, because terms used in connection with the tax code are to be afforded their ordinary meaning unless otherwise indicated, *see Hanover Bank v. Commissioner of Internal Revenue,* 369 U.S. 672, 687, 82 S.Ct. 1080, 1089, 8 L.Ed.2d 187 (1962); *Deputy v. Du Pont,* 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416 (1939), we are constrained to conclude that, since the parties take conflicting positions, as to *when* the revenue agent raised the issue of the propriety of the amount of the interest deductions claimed, genuine issues of material fact are present. Therefore, this issue is not ripe for summary judgment.

The only probative evidence of this fact is an uncontroverted affidavit of Revenue

---

**22.** "Revenue Procedure 84–28 applies to [the Rule of] 78's method loans (other than short-term consumer loans) where the interest under the 78's method *exceeds* the loan payments during any year of the loan. All borrowers and lenders with loans covered by this revenue procedure must change to [the economic accrual] method on their federal income tax returns for the first tax year ending on or after December 31, 1983." ——— Taxes 312, 317, *The Rule of 78's in Light of Revenue Ruling 83–84* (April 1985) (emphasis in original).

Agent Hudak. Hudak's affidavit establishes that: (i) on September 13, 1983, he *discussed* examination of the FDI group with the group's controller and tax manager; (ii) on September 14, 1983, he delivered an appointment letter for scheduling the examination and a document request which sought materials *needed to verify* claimed interest deductions; (iii) on October 7, 1983, he *discussed* the audit examination of the FDI group with the tax manager and with an official from Price Waterhouse, CPAs; (iv) during the months of October, November, and December 1983, he received various requested documents and information for *verification* purposes; and (v) during October, November, and December 1983, and for "some time thereafter," the FDI group partnerships, including Quincy, were under audit examination (*i.e.*, verification), with respect to their claimed interest deductions for 1981 and 1982.

The first problem the court encounters with the foregoing "evidence" is that it is *not* determinative of the ultimate question presented, *i.e.*, on what date did the revenue agent "raise" an issue with respect to the propriety of deducting a specific amount of interest pursuant to the Rule of 78's method. Clearly, when an agent engages a taxpayer preliminary to undertaking an audit, he requests certain threshold information needed in order to *verify* the deduction(s) in issue. As stated, Hudak, on September 14, 1983, delivered to FDI his appointment letter and a document request for materials "needed to verify" the claimed interest deduction. However, verification is, we believe, not tantamount to "putting [the issue] forward for consideration." Verification in an accounting sense is the "process of substantiating entries in books of account." *Black's Law Dictionary* 1400 (5th ed. 1979). At some point in the verification process, the revenue agent had to have contacted Quincy and indicated: (i) that the Service would *not* accept the interest deductions as computed and claimed pursuant to the Rule of 78's method; and (ii) that changes would be proposed as an adjustment to the claimed deduction. There is absolutely not one scintilla of evidence from either party establishing the

*operative* date this critical event occurred. Thus, factual questions remain unanswered and neither party is, as a consequence, entitled to summary relief on this issue. In short, there are genuine issues of material fact.

Accordingly, we conclude that, other than the conclusory assertions of fact proffered by the parties, neither has adequately *factually* established when, where, in what manner, and with whom the issue regarding the use of the Rule of 78's method was "raised." Inasmuch as these genuine issues of material fact have not been definitively established by the parties, we hold that neither is entitled to summary relief under Count III of the complaint, and DENY both motions for same. *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555.

CONCLUSION

For the reasons stated above, we hereby GRANT defendant's motion for partial summary judgment on Count II and DENY plaintiffs' motion for partial summary judgment on Count II. Said count is dismissed with prejudice. We DENY both plaintiffs' and defendant's motions for partial summary judgment as they relate to Count III.

Within 20 days from the date of service of this opinion, the parties shall file a joint statement with this court specifically delineating each step as to how they wish to proceed towards a definitive resolution of Counts I and III.

IT IS SO ORDERED.

APPENDIX

With respect to subject proposed deductions, the Private Placement Memorandum provided:

(b) *Risk of Audit and Disallowance of Partnership Deductions.* Information returns filed by the Partnership are subject to audit by the IRS. The IRS is devoting greater attention to the proper application of the tax laws to partnerships, including partnerships investing in real estate. In this connection, the IRS recently issued revised guidelines, procedures and instructions for handling cases

under its tax *shelter audit program.* (emphasis added)

The Commissioner of Internal Revenue has announced that IRS audits of tax shelters will be expanded, and that the IRS plans to examine 25% of partnership returns showing losses exceeding $25,-000. It is probable that such course will be followed for future years. The Partnership's return is expected to show losses in excess of $25,000. An audit of the Partnership's return may lead to adjustments, in which event the Investors may be required to file amended personal Federal income tax returns.

There is further risk that even if some deductions are not disallowed entirely a different tax treatment may be given various items than that which is contemplated or reported in the Partnership Information Return.... *[T]he IRS may challenge the deductibility of a portion of the interest payments on the Wraparound Mortgage....* (emphasis added)

(c) *Deductibility of Interest.* The Partnership intends to accrue and deduct interest payable under the Wraparound Mortgage pursuant to the Rule of 78's method.... The *application of the Rule of 78's method results in a far greater proportion of debt service in the early years being treated as deductible interest rather than non-deductible principal.* It is the opinion of counsel that the Partnership may deduct interest on the Wraparound Mortgage pursuant to the Rule of 78's method. *However, the law in this area is not clearly developed.* Accordingly, *there can be no assurance that IRS will not contend that the use of the Rule of 78's method* by the Partnership *does not clearly reflect its income,* in which event a substantial portion of the Partnership's interest deductions in the early years would be disallowed, and deferred to later years. (emphasis added)

## FEDERAL TAX CONSEQUENCES

The following statements, together with the opinion of counsel referred to below, are based upon the provisions of the Code as amended most recently by the Tax Reform Act of 1976, the Revenue Act of 1978 and the Technical Corrections Act of 1979, the applicable existing and proposed regulations thereunder, existing judicial decisions, pending cases, and current administrative rulings and practice. It is emphasized, however, that no assurance can be given that legislative, judicial or administrative changes may not be forthcoming which would modify such statements. Additionally, it should be noted that no regulations have been proposed or passed, nor are there judicial decisions or administrative rulings, in regard to the recent amendments to the Code which are relevant to this investment. Accordingly, certain of the new code amendments discussed hereafter may be further amended, modified or clarified....

[T]here can be no assurance that the IRS, upon audit of the Partnership's or a Limited Partner's tax return, will not take a position which differs from the proposed treatment [of Partnership deductions].... [Thus], ... the tax benefits expected to be derived from an investment in the Partnership may be reduced or eliminated.

### Allocation of Profits and Losses

[T]here can be no assurance that the IRS may not reallocate such Partnership items in a manner different from that set forth in the Partnership Agreement, in which event the tax benefits anticipated ... could be reduced.

For example, if, upon audit, the IRS should contend that any of such allocations lack *"substantial economic effect,"* there [can be] a possibility that certain of the deductions allocated to the Partners will not be fully allowable to them.

### Deductions Taken by the Partnership

Although counsel will render their opinion that the Partnership may utilize the Rule of 78's method, it should be noted that *there is no authority specifically approving the use of such method in a transaction similar to this case.* It is

possible that because such method will result in increasing the Partnership's interest deductions in the early years of its operation of the Project, and a decrease in interest deductions in later years, *the IRS may determine that it does not "clearly reflect" the Partnership's income under Code Section 446.* (emphasis added)

### Limitation on Deduction of Interest

Each Investor should note that a portion of the Partnership's interest expense incurred under the Wraparound Mortgage, ... may be limited as to immediate deductibility as paid....

(a) Section 163(d) imposes a substantial limitation upon the ability of a non-corporate taxpayer to deduct interest on funds borrowed to purchase or carry property "held for investment". Deductions for such investment interest incurred in any year may not be taken by an individual to the extent such deductions for any year exceed the sum of: (i) $10,000 ...; (ii) net investment income ...; and (iii) the excess of certain expenses ... attributable to property subject to a "net lease" over the gross rental income therefrom.

Defendant's Appendix B, pp. A120, A121, A133, A134, A140–142, and A148.